Virginia Diann FANCHER, Plaintiff,

v.

Robert NIMMO, Head of the Veterans Administration, an Agency of the United States of America, Defendant.

No. LR–C–79–541.

United States District Court,
E.D. Arkansas, W.D.

Nov. 2, 1982.

W. Michael Hamilton, Kaplan, Brewer, & Bilheimer, Little Rock, Ark., for plaintiff.

Diane Mackey, Asst. U.S. Atty., E.D. Ark., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ELSIJANE TRIMBLE ROY, District Judge.

Plaintiff Virginia Diann Fancher filed a timely action pursuant to 42 U.S.C. § 2000e–2(a)(2) for redress against discrimination in employment on the basis of sex.

Ms. Fancher is a female adult citizen of the United States residing in Little Rock, Arkansas. She was employed by the Veterans Administration Medical Center (VAMC) in Little Rock, Arkansas, from May 21, 1973, to March 26, 1979.

Defendant Robert Nimmo is head of the Veterans Administration, an agency of the government of the United States of America which operates a hospital located at 300 East Roosevelt Road in Little Rock, Arkansas. The defendant employs more than fifteen persons and is thus an employer within the meaning of 42 U.S.C. § 2000e.

At the time of the alleged discrimination, Ms. Fancher was employed as a technician in the VAMC's Nuclear Medicine Services, in a GS-7-1 pay slot. She had held this position for approximately five years. Her job consisted of the utilization of radioactive substances for the diagnosis and therapy of disease in humans.

In December 1977 Ms. Fancher informed her supervisor, Suzanne Bernard, that she suspected she was pregnant. In the latter part of January 1978, after she had confirmed that she was in fact pregnant, she so advised Ms. Bernard. The testimony was in conflict as to whether plaintiff presented Ms. Bernard with a note from her personal physician, Dr. Charles Allen McKnight. There is no dispute, however, that both Ms. Bernard and Mr. Stuart Eason (Ms. Bernard's supervisor) knew of the plaintiff's pregnancy by the end of January 1978. Neither Ms. Bernard nor Mr. Eason notified the hospital personnel office that Ms. Fancher was pregnant, which notification was their clear responsibility pursuant to the hospital's personnel policies pertaining to pregnant employees.

In any event, immediately after learning that the plaintiff was definitely pregnant, Ms. Bernard placed her on limited duty. Plaintiff continued to be assigned to the Nuclear Medicine Department and was part of the rotation schedule but was told not to perform those duties which involved heavy lifting or which would expose her to unnecessary radiation. Particularly, the plaintiff's work consisted of camera work, paperwork, scheduling and other miscellaneous work that needed to be done. In a prior pregnancy, plaintiff had been assigned to the Radioimmunoassay (RIA) lab section of Nuclear Medicine where she had no exposure to "hot" (radioactive) items. The RIA lab was still in existence in 1978 and she spent several weeks there in February.

Ms. Bernard testified that she had put Ms. Fancher on limited duty because it was best for the plaintiff in her pregnant condition. The decision to put the plaintiff on limited duty status was consistent with the Federal Personnel Manual's regulations and the Veterans Administration's policy as they related to pregnant employees. The Federal Personnel Manual, Chapter 630, Subchapter 13, entitled "Absence for Maternity Reasons" states in pertinent part:

"If after consulting her physician, the employee requests modification of her work assignment, every reasonable effort should be made to accomodate her request."

The Veterans Administration's own leave and absence policy, Memorandum No. 76–3, 4E(2)(b), January 8, 1976, states:

"When an employee reports her pregnancy, her supervisor shall immediately determine (with advice from the Personnel Physician and the employee's personal physician where necessary) whether the employee's duties and work surroundings involve exposure to health hazards peculiar to her condition. Where such conditions exist in an employee's regularly assigned duties, reasonable effort shall be made to detail or temporarily reassign her to other available work that she is qualified to perform."

The plaintiff's placement on limited duty was consistent with the practice the defendant had followed in previous years. Prior to 1977 the plaintiff had been pregnant three other times while working for defendant. The first two pregnancies terminated with miscarriages in 1974 and 1975, and the third pregnancy (1976) went full term. During the first two pregnancies, Ms. Fancher was not reassigned from the Nuclear Medicine Department but was placed on limited duty to reduce her exposure to radiation and to relieve her from lifting heavy objects. After returning from leave taken because of her miscarriages, she resumed full duties in Nuclear Medicine. In 1976, during her third pregnancy, plaintiff was assigned to the RIA lab, a component of the Nuclear Medicine Department where there is no danger of inadvertent exposure to radiation. She gave birth in July 1976 and returned to work in November of the same year. Upon returning, plaintiff was reassigned permanently to RIA lab upon her own request.

Sometime in 1977 the Nuclear Medicine Department was reorganized so that all the technicians would be assigned on a rotation basis to both the RIA lab and to the Scan lab, the component of nuclear medicine where exposure to radiation was greater. Plaintiff remained part of that rotation schedule when she was placed on limited duty in January 1978, but she was not required to perform any duties involving exposure to "hot" areas in the Scan lab.

Plaintiff was allowed to remain on this limited work detail until April 19, 1978, at which time Ms. Bernard informed her that she would have to return to full duty. It appears from the testimony that "full duty" was not to include heavy lifting, but it was certainly to include "hot" lab functions.

Ms. Bernard testified that she had consulted with Dr. Charles Boyd, Acting Chief of Nuclear Medicine Services, and Erick Erickson, Radiation Safety Officer, before returning Ms. Fancher to full duty in order to determine what the radiation risks were. She testified that the Nuclear Regulatory Commission's (NRC) regulations were discussed in detail. However, each of defendant's witnesses admitted that the hospital's maternity leave policies were never discussed at any time. Several defense witnesses, including Ms. Bernard, admitted that they were unaware that the hospital even had any maternity regulations. It was also admitted by the defense that exposure to radiation in Nuclear Medicine's Scan lab constituted a "health hazard."

The testimony is somewhat inconsistent with regard to the reasons for Ms. Bernard's decision to return Ms. Fancher to a full duty status. In her testimony, Ms. Bernard initially stated that an increase in Nuclear Medicine's workload required her to utilize Ms. Fancher in a full duty capacity and that such a change was necessary in order to keep the quality of patient care from suffering. Later, however, she testified that she removed Ms. Fancher from limited duty as a form of discipline, saying that if Ms. Fancher had been performing her limited duties properly, she would not have been returned to full duty, regardless of the workload. Yet a third reason was voiced by Mr. Jim Fly, former Personnel Management Specialist for the hospital, who testified that Ms. Bernard told him at the time of the incident that the reason for the return of Ms. Fancher to full duty was simply that plaintiff was in the later stages of her pregnancy and therefore the dangers from radiation were not as great.

With respect to whether Ms. Fancher was properly performing her limited duties, there is much conflict in the testimony. Ms. Bernard and several of the plaintiff's co-workers testified that plaintiff had begun shirking her duties, often being away from her work station, reading, or talking with the secretaries. Several co-workers testified that during the time period concerned, Ms. Fancher was not doing as much work as they were; they admitted, however, that they did not even know that Ms. Fancher had been placed on a limited duty status. The plaintiff denied shirking any of her duties, stating that she performed everything which was required of her.

Ms. Fancher's personnel file indicated that she was a model employee. In her most recent evaluation, which was dated June 28, 1977, she had been given an excellent performance appraisal. More importantly, her personnel file contains no reprimands or notations of any kind concerning any unsatisfactory job performance during the January-April 1978 period. Mr. Jim Fly, the Personnel Management Specialist, testified that under the hospital's policies the plaintiff would have been given some kind of notice of her deficiencies and a record of the deficiencies would have been placed in the personnel file before any disciplinary action such as this would have been taken.

The credible evidence indicates that Ms. Bernard's April 19, 1978, decision to return the plaintiff to a full duty status was in reality (as Ms. Bernard herself admitted at trial) a form of disciplinary action. This action had the effect of placing Ms. Fancher and her unborn child in danger of exposure to harmful radiation, in direct and blatant conflict with the mandates of the

personnel policies under which the defendant was required to operate. In light of this finding, it is irrelevant whether or not Ms. Fancher was actually shirking her duties. Returning her to full duty status in Nuclear Medicine was prohibited in any event, for whatever reason, by the hospital's pregnancy policies.

Although the plaintiff was greatly concerned about the radiation to which she would be exposed on full duty, she nevertheless proceeded to perform her full duties on April 19 and reported to work on April 20 to perform full duties. Sometime on April 20 the plaintiff was called into a meeting with Dr. Boyd, Mr. Eason (the Administrative Officer and Physicist for the Nuclear Medicine Department), Mr. Erickson, and Ms. Bernard. During that meeting, the Nuclear Regulatory Commission regulations were explained to Ms. Fancher. She was told that the level of radiation to which she was being exposed was within the NRC's guidelines and that, in their opinion, neither she nor her unborn child were in any danger.

After the meeting with the plaintiff, Dr. Boyd then met with Mr. Parrish (the hospital's Director), Mr. McCracken (the Assistant Director), and Mr. Vedder (the Personnel Director). Dr. Boyd was directed to contact the plaintiff's personal physician to advise him that the plaintiff's radiation exposure was within NRC guidelines and to determine whether the plaintiff had any peculiar medical problems. Dr. Boyd contacted Dr. McKnight, Ms. Fancher's personal physician, and solicited from him a letter outlining McKnight's position. Dr. McKnight issued a statement on April 21, 1978, advising that he did not want Ms. Fancher exposed to any radiation. Dr. Bethel, the hospital Personnel Physician, reviewed Dr. McKnight's letter and suggested that his recommendation be followed, i.e., that Ms. Fancher be removed from any exposure to radiation.

Plaintiff returned to her full duties after the April 20 meeting but soon thereafter began to experience considerable fluid leakage. Alarmed that the leakage was of embryotic fluid, plaintiff left work to see her doctor. In the meantime, the plaintiff's husband contacted local congressional offices to determine whether or not some action could be taken which would allow plaintiff to continue working and at the same time protect their unborn child from unnecessary radiation exposure. Several of the congressional offices then contacted Mr. McCracken, the Assistant Director, to investigate the matter.

Mr. McCracken, in response to the congressional calls, contacted Jim Fly, Personnel Management Specialist, to determine whether there was a position available outside of Nuclear Medicine for which Ms. Fancher was qualified. Mr. Fly located a position in the Chemistry Lab which was temporarily vacant due to a maternity leave. On April 21, 1978, the plaintiff was temporarily detailed to this position. The evidence indicated that this temporary detail would have been available up until the time the plaintiff's own maternity leave commenced.

During the period between April 21 and April 27, 1978, the plaintiff worked in the Chemistry Lab on temporary detail. The testimony shows that she was happy with the reassignment and had no problems with her co-workers.

On April 27, 1978, Mr. Fly offered Ms. Fancher a GS–5–9 position in the Chemistry Lab on a permanent basis. This offer was rejected by plaintiff because it would have meant a downgrade. In terms of money, the GS–5–9 position in the Chemistry Lab actually paid some $300 per year more than plaintiff's GS–7–1 position in Nuclear Medicine. However, the plaintiff was in line for a step increase which would have eventually raised her salary in Nuclear Medicine to a higher level than the GS–5–9 position salary. It also meant a downgrade to a lower dead-end position which was out of the field in which she had trained for nearly five years and in which she desired to work. Lastly, it was clearly in violation of the Veterans Administration's personnel regulations.

Mr. Fly communicated the plaintiff's rejection of the permanent reassignment to his supervisor. He was directed by Mr. Vedder, the Personnel Director, to give the plaintiff three options: (1) she could stay in Nuclear Medicine (on a full duty status); (2) she could take early maternity leave; or (3) she could accept a permanent reassignment to the Chemistry Lab at the lower pay grade. Mr. Parrish testified that under the hospital's policies, the first option listed above should never have been given to the plaintiff. The evidence shows that all hospital officials during the relevant periods failed to refer to the hospital's policies as it related to pregnant females to determine what course of action should have been taken.

Mr. Fly communicated these three options to the plaintiff on Friday, April 28, 1978, and asked for an answer that same day. Ms. Fancher told him that she was not able to give him an immediate answer and requested more time. She was given until Monday, May 1, 1978, to decide. With each successive demand placed upon her, plaintiff became more upset and more anxious for her baby.

On Monday morning, May 1, 1978, Ms. Fancher called in sick. She reported to Mr. Fly on May 2 and told him that she felt she had no other choice than to accept permanent assignment to the Chemistry Lab. She testified that she accepted that assignment in order to protect her unborn child from exposure to hazardous radiation and in order to continue working. Mr. Fly prepared a letter requesting the transfer for plaintiff's signature. The plaintiff reported to work in the Chemistry Lab and remained there until June 30, 1978, at which time she began her maternity leave.

Two reasons were given at trial as explanations for the necessity of permanently reassigning the plaintiff to the Chemistry Lab, as opposed to merely temporarily detailing her to another department as required by the defendant's policies with regard to pregnant women. One reason, as stated by Ms. Bernard, was that by April 1978 the workload in Nuclear Medicine had increased to such a degree that the vacancy created by Ms. Fancher's absence had to be immediately filled. A flow chart showing the number of tests performed in Nuclear Medicine from 1977 through 1981 indicates that the workload had in fact increased during the January 1978—March 1978 period. It peaked in March, however, and generally declined thereafter until July 1978, at which time it began to rise again.

The Court thus finds that at the time Ms. Fancher was given the choice of permanent rather than temporary reassignment, there was not such an increase in the Nuclear Medicine workload which would have justified her permanent reassignment. Moreover, the Court notes that Mr. Parrish, the hospital's chief administrator, testified that the workload in Nuclear Medicine was irrelevant, and that his primary concern was to remove Ms. Fancher from that department and to place her temporarily in some other job which she was qualified to perform for the duration of her pregnancy.

Also, the evidence showed that Nuclear Medicine had, at least on one previous occasion, instituted a flexible policy toward absent workers: Employee Cliff Young had been on a medical leave of absence without pay for over a year, and the department had continued to operate without filling the vacancy. There was additional testimony that, although it may have been difficult, it would have been possible to hire someone on a temporary basis to fill Ms. Fancher's position while she was absent from the department.

The second reason given in explanation of the need for a permanent transfer was voiced by Personnel Management Specialist Jim Fly, who testified that a lot of the other employees in Nuclear Medicine felt that Ms. Fancher was receiving special treatment and were angry about having to do her work. According to Fly, the decision to reassign Ms. Fancher on a permanent basis was made by Mr. Parrish. The evidence shows that there was indeed some resentment against the plaintiff on the part of her co-workers. In fact, Ms. Bernard admitted having planned to organize a cam-

paign to get great numbers of people to call then Congressman Jim Guy Tucker's office and complain if Ms. Fancher continued to receive special treatment. The record indicates, however, that the other employees in Nuclear Medicine were never told that the "special treatment" accorded Ms. Fancher was mandated by the personnel regulations regarding treatment of pregnant females. The Court finds that the fact that other employees in the Nuclear Medicine Department were upset about the treatment given to Ms. Fancher did not warrant permanently reassigning her to a different department.

After receiving several extensions on her leave without pay, Ms. Fancher returned to work on March 26, 1979. She had been advised by letters from Mr. Parrish written on March 15, 20 and 23, 1979, that she would be assigned upon her return as a Biological Laboratory Technician (Research Service) at a GS–7–2 pay level, which was the same grade, step, and salary level at which she would have been had she never been pregnant.

On March 16, 1979, Ms. Fancher's attorney notified Mr. Parrish that she would accept only a reassignment to Nuclear Medicine, and that any other assignment was unsatisfactory. At trial Ms. Fancher testified that the reason for her insistence upon working in Nuclear Medicine rather than in the Biology Lab was that all of her previous training was in Nuclear Medicine. More importantly, she stated that in the Biology Lab she would be doing strictly research, with no patient contact. Working directly with the patients was especially important to Ms. Fancher due to the fact that her father was a disabled veteran. Plaintiff stated that she had communicated her desire to work with the patients to the hospital administration. Finally, she stated that assignment to Nuclear Medicine was preferable to the position in the Biology Lab due to the fact that the latter position offered less job security in that it was a federally funded grant position.

Until as late as March 20, 1979, Ms. Fancher continued to make requests for extensions of her leave without pay pending the resolution of her EEO complaint. Her requests for extensions were finally denied, and she was directed to return to work at 8:00 a.m. on March 26, 1979. She did so, reporting shortly before 8:00 a.m. to the Biology Lab where a co-worker showed her around and explained her duties to her. Soon thereafter she requested permission to go to the personnel office where she turned in her handwritten notice of resignation. Ms. Fancher testified that she had prepared the letter of resignation prior to coming to work that day.

The plaintiff contends that her rights under Title VII were violated when she was assigned to the Biology Lab instead of being reassigned to Nuclear Medicine upon her return from maternity leave, and that her resignation was in fact a constructive discharge. The Veterans Administration personnel policy regarding reassignments after periods of leave without pay is to return the person to the same position or to a position of like seniority, status and pay. Records of persons who had taken leave without pay showed that those employees who returned to work were nearly always restored to their previous positions.

The evidence shows that in March 1979 there were no vacancies in Nuclear Medicine to which plaintiff could have been assigned. However, at least one of the reasons that there were no vacancies was the April 1978 decision to permanently reassign Ms. Fancher to another department. As noted above, there were insufficient explanations given for this decision. Thus the Court is constrained to find that the defendant's placement of the plaintiff in the Biology Lab was a continuation of the violation of the plaintiff's rights, despite the fact that the new position was of like seniority, status and pay as her previous position in Nuclear Medicine.

### Conclusions of Law

Plaintiff Virginia Diann Fancher filed her formal complaint with the defendant's Equal Employment Officer on May 1, 1978, and has pursued her complaint through the

entire range of procedures available. She has thus exhausted her administrative remedies which are a prerequisite to filing an action in federal court. *See, Brown v. GSA,* 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976):

> "Initially, the complainant must seek relief in the agency that has allegedly discriminated against him."

Plaintiff filed a timely action pursuant to 42 U.S.C. § 2000e for redress against discrimination in employment on the basis of sex, and the Court has jurisdiction over the parties and over the subject matter of this case pursuant to 28 U.S.C. § 1343(4) and 42 U.S.C. § 2000e–5(f)(3).

The plaintiff's claim amounts to one of disparate treatment which in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), was declared unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Section 2000e–2(a)(2) provides:

> "a. It shall be an unlawful employment practice for an employer—
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

This Court has previously ruled that with respect to claims which originated from actions taken by the defendant prior to the effective date of 42 U.S.C. § 2000e(k) [1] (October 31, 1978) to prevail the plaintiff must show such actions to have imposed a substantial burden on her because of her pregnancy, as per *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). With respect to claims arising from the defendant's actions after the effective date of § 2000e(k), the standard therein will be applied, i.e., that a pregnant woman shall be treated the same as other nonpregnant persons in similar circumstances.

■ With respect to the 1978 incidents, the Court finds that a prima facie case was established that the plaintiff was substantially burdened by the defendant's failure to properly administer its personnel policies as they related to pregnant females. Under the defendant's policies the plaintiff should have been detailed or temporarily assigned to do work which would not have exposed her to the radiation hazards. In failing to follow its policy, the defendant "burdened" plaintiff on April 19, 1978, by requiring her to return to full duties in Nuclear Medicine. The defendant further "burdened" plaintiff on April 28, 1978, by forcing her to choose among options which did not meet the hospital's policies, and by exerting unnecessary pressure upon her to make a decision within an unreasonably short period of time. Thus the Court finds that the defendant burdened the plaintiff in such a way as to deprive her of employment opportunities because of her "different role" in violation of the mandates set forth in *Nashville Gas Co. v. Satty, supra,* 434 U.S. at 142, 98 S.Ct. at 351.

■ As for the 1979 occurrences, the Court finds that the failure to assign Ms. Fancher to her former position in the Nuclear Medicine Department was a continuation of the discrimination which had begun the previous year. Thus a prima facie case was established that the defendant treated the plaintiff differently from other nonpregnant employees in violation of 42 U.S.C. § 2000e(k).

■ Once such a prima facie case has been made by the plaintiff, it is then incumbent upon the defendant, in rebuttal, to articulate some legitimate, nondiscriminatory reason for its employment decisions. *See, Board of Trustees v. Sweeney,* 439 U.S.

---

1. 42 U.S.C. § 2000e(k) provides in relevant part, "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, ... as other persons not so affected but similar in their ability or inability to work ..."

24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Taylor v. Teletype Corp.*, 648 F.2d 1129 (8th Cir.1981); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115 (8th Cir.1981); *Ligons v. Bechtel Power Corp.*, 625 F.2d 771 (8th Cir. 1980). The defendant's burden of production, the plaintiff's continuing burden of persuasion, and the reasons therefor were succinctly set forth by the United States Supreme Court in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as follows:

"The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons ... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

"The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

101 S.Ct. at 1094–1095.

■ As noted above, the reasons advanced for the defendant's decision on April 19, 1978, to return the plaintiff to full duty status in Nuclear Medicine were: (1) the workload was such that patient care would suffer if the plaintiff did not perform her full duties; (2) the plaintiff had been shirking her duties and was returned to full duty as a form of discipline; and (3) the plaintiff was in the later stages of her pregnancy and thus was not as likely to suffer any damage from radiation exposure as she might have in the earlier stages of her pregnancy. None of these reasons serve to rebut the plaintiff's prima facie showing of discrimination. As noted above, each explanation contravenes the defendant's own policies with regard to the treatment of pregnant females.

■ The two reasons given for the April 28, 1978, decision to offer Ms. Fancher a permanent, as opposed to a temporary, position in the Chemistry Lab were: (1) the increased workload in Nuclear Medicine mandated that the plaintiff's position be filled immediately; and (2) the resentment which had been generated against Ms. Fancher by the other Nuclear Medicine employees who were upset by the "special treatment" which she had previously received was such that her permanent removal was necessary to the smooth functioning of the Nuclear Medicine Department. Neither of these reasons is sufficient to rebut the plaintiff's prima facie case of discrimination. As noted above, the evidence showed that the workload actually declined in April 1978 and continued to do so through July 1978. As for the other employees' hostility toward the plaintiff, such was wholly unwarranted, in that the "special treatment" afforded the plaintiff from

January 1978—April 19, 1978, was merely that which was required under the hospital's personnel policies regarding pregnant employees. Clearly such hostility was insufficient grounds for permanently removing the plaintiff from the department.

■ With respect to the March 26, 1979, return of the plaintiff to a position in the Biology Lab rather than to Nuclear Medicine, the reason proffered by the defendant was that there were no vacancies in the Nuclear Medicine Department at the time of plaintiff's return. No vacancy existed, however, as previously noted herein, because of the defendant's prior discrimination on April 28, 1978, when the plaintiff was forced to accept a permanent reassignment out of Nuclear Medicine. The defendant has thus failed to rebut the plaintiff's showing of discrimination based upon her pregnancy.

As for the question of constructive discharge on March 26, 1979, the evidence indicates that no pressure was exerted upon the plaintiff to force her to resign. Rather, it appears that she made the decision to resign on her own accord prior to returning to work and not in response to the actual work conditions to which she was assigned. Indeed, in the half hour or so which she spent in the Biology Lab on March 26, 1979, she hardly had the opportunity to discover whether or not the work was so onerous as to be unbearable. By her own testimony she agreed that she had found nothing hateful about the work.

■ In order to show constructive discharge, a plaintiff must show that she had no choice at all before her resignation would be deemed involuntary as a matter of law. Constructive discharge was discussed in *Christie v. United States,* 518 F.2d 584, 587 (Ct.Cl.1975), as follows:

"Employee resignations were presumed to be voluntary. This presumption will prevail unless plaintiff comes forward with sufficient evidence to establish that the resignation was involuntarily extracted . . .

"Duress is not measured by the employee's subjective evaluation of a situation. Rather the test is an objective one . . .

"[Under the facts in *Christie* ] plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff *had a choice.* She could stand pat and fight. She chose not to."

The record does not support allegations of duress or coercion on March 26, 1979. The plaintiff suffered no downgrade. In fact, she was at the same grade level she would have attained had she never been pregnant. Nor is there evidence to show any reason why she could not "stand pat and fight" for reassignment. Indeed, she chose not to, and this Court will not find constructive discharge in the events of March 26, 1979. See, also, *Stanley v. Commissioners, U.S. Civil Service Commission,* 505 F.Supp. 63 (W.D.Mo.1980); *Nolan v. Cleland,* 482 F.Supp. 668, 672 (N.D.Cal.1979).

In sum, the evidence presented at trial supports a finding that Ms. Fancher was discriminated against on April 19 and April 28, 1978, when she was no longer allowed to perform light duty work and was ordered (1) to perform full duties in Nuclear Medicine, (2) to take early maternity leave or (3) to be reassigned permanently to laboratory services. The evidence further shows that the plaintiff was discriminated against on March 26, 1979, when she was required to return to work in the Biology Lab instead of in Nuclear Medicine. These actions were in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

The evidence does not, however, support the plaintiff's theory of constructive discharge and therefore she is not entitled to reinstatement or recovery of back pay or front pay. Due to the fact that she was actually earning slightly more from May 2, 1978—June 30, 1978, in the Chemistry Lab than she had been earning in Nuclear Medicine, the plaintiff is not entitled to compensation for any lost earnings during that period. Nor was there any discrepancy between her salary as a technician in the

**1334**

Biology Lab on March 26, 1979, and the salary which she would have received in Nuclear Medicine had she never become pregnant.

The plaintiff is entitled to a declaratory judgment that the above-mentioned actions of the defendant which have been determined to be discriminatory violated her rights guaranteed by Title VII of the Civil Rights Act of 1964, as amended, and to a permanent injunction prohibiting the defendant from engaging in the policies and practices which have herein been found to be discriminatory.

The plaintiff is also entitled to recovery of her costs and reasonable attorney's fees as provided for by 42 U.S.C. § 2000e–5(k).

IT IS SO ORDERED this 2nd day of November 1982.

### JUDGMENT

In accordance with the provisions of the Memorandum Opinion entered herein this date,

IT IS HEREBY ORDERED AND ADJUDGED:

That the defendant violated the plaintiff's rights under Title VII of the Civil Rights Act of 1964 by removing her from her limited duty status on April 19, 1978; by forcing her to accept a permanent reassignment to another department on April 28, 1978; and by failing to reassign her to the Nuclear Medicine Department on March 26, 1979. Due to said violations, the defendant is hereby permanently enjoined from engaging in any of the policies and practices which have herein been determined to be discriminatory.

Further, the defendant is hereby ordered to pay the costs of this action, together with reasonable attorney's fees pursuant to 42 U.S.C. § 2000e–5(k). Counsel for the plaintiff shall, within 20 days hereof, submit his pleadings and affidavits in this regard, to which the defendant shall, if he so desires, respond within 10 days of receipt of plaintiff's submissions.