Linda Sue **PARKER**, Plaintiff,

v.

**SIEMENS–ALLIS, INC., Defendant.**

**No. LR–C–83–203.**

United States District Court,
E.D. Arkansas, W.D.

Jan. 30, 1985.

As Amended Feb. 21, 1985.

Janet L. Pulliam, Pulliam Law Offices, Little Rock, Ark., for plaintiff.

Donna Smith Galchus, House, Wallace & Jewell, P.A., Little Rock, Ark., for defendant.

1. Defendant contends Plaintiff was laid off rather than terminated. The Court will discuss this

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROY, District Judge.

1. The Plaintiff, Linda Parker was employed by the Defendant Siemens-Allis on April 6, 1970, and continued her employment with the Defendant until her termination on September 2, 1980. The present lawsuit was brought as a result of the termination.[1] Plaintiff alleges she was terminated on the basis of her sex.

2. Defendant's Little Rock plant manufactures small motors. It is divided into the following departments: Electrical Assembly, Machine Shop and Final Assembly. The first line supervisors in these areas are foremen who at the time of Parker's employment reported to superintendents. The superintendents reported to the production manager.

3. Plaintiff made application at Siemens-Allis in February of 1970. Although she was not offered a job at that time, she was offered a slot to participate in the company training program with no pay for her participation and no guarantee of a job.

4. Upon opening its new facility in Little Rock, Defendant hired Plaintiff on April 6, 1970.

5. Defendant contends that Plaintiff misrepresented her employment history on her application. Specifically, Plaintiff failed to acknowledge her prior employment with Timex. Plaintiff was employed twice at Timex but failed to note such on her application. Apparently, Plaintiff had been counseled for excess absenteeism during her first employment at Timex, and was terminated from her second employment at Timex because she walked off the job. The Court took the above information into consideration when assessing credibility, and, considering the evidence as a whole, placed little weight on the deletion.

6. Plaintiff's initial job assignment was stator winder in the electrical department. Plaintiff's application shows that she applied for a "machine or assembly or inspec-

more fully later when dealing with the theory of constructive discharge.

tor" position. Defendant contends Plaintiff did not request employment in the machine shop. The Court finds Defendant's construction of the application unreasonable. Further, Plaintiff testified that she applied for the machine shop or assembly as her first choice because she had worked in the electrical industry before and knew that the machine shop positions paid more than positions in the electrical department. Despite her application, she was assigned to work in the electrical department.

7. From the time of Plaintiff's hire to the present, the majority of the machine shop and stator assembly employees have been male, while the majority of the electrical department employees have been typically female. This is evidence of a pattern and practice of discrimination in job assignment and steering.

8. Further steering and job assignment was evidenced by the Plaintiff's unrebutted testimony that there are certain jobs in even the electrical department which are held by males, the dip and bake, set up, leadman and foreman positions. No evidence was presented indicating that females were not capable of performing those jobs.

9. Ten years after Plaintiff's hire, the machine shop was 95 percent male and assembly was 80 percent male, while the electrical department was 85 percent female.

10. Plaintiff remained in the position of stator winder for four to six months and was promoted to stator testor, a position which she held for two years before being promoted to foreman. Next, Plaintiff was promoted to foreman in the electrical department on March 16, 1974, and held that position until 1980 when she was terminated.

11. Plaintiff stated that she cross-trained in the machine shop. Plaintiff contends that she was discriminated against because of her sex since Carl Garmon was promoted to foreman in 1972. Although Plaintiff failed to list this alleged discrimination on her EEOC charge, the promotion claim is like or related to the substance of the Plaintiff's charge.

12. Carl Garmon, a male whose initial hire date is April 13, 1970 (seven days after that of the Plaintiff) and who had never worked in the electrical department, was promoted to foreman in her department in 1972. It took Plaintiff twice as long to reach the position of foreman as the time required for Garmon. Defendant contends that Garmon was asked to take a foreman's position over both Final Assembly and the Electrical Assembly Department on the second shift—3:30 p.m.—11:00 p.m., and that Plaintiff was not intersted in a second shift position because she wanted to work the same hours as her husband. Although Plaintiff testified she wanted to work the same day hours as her husband, no evidence was presented showing that Defendant asked Plaintiff if she would be willing to work a shift other than the day shift. In fact, Plaintiff testified she would have accepted Garmon's position if it had been offered to her.

13. Both the testimony and the exhibits introduced by Plaintiff indicate that six of the nine male foremen were promoted to foreman at a rate faster than Plaintiff.

14. The Court finds it significant that there had never been a female foreman in the plant's history before the promotion of the Plaintiff. Further, there have been no female foremen since her termination.

15. The Affirmative Action Plan and Defendant's Answers to Interrogatories show the work force is 30–40 percent female.

16. Promotions to first line supervisor are made from within the work force.

17. Plaintiff complained to Fred Quick, her immediate supervisor, that Garmon had less seniority and no prior experience in the electrical department, but no action was taken with respect to her complaint.

18. Defendant contends that while Plaintiff was a collective bargaining unit employee, jobs were posted and any employee could bid on any opening. Defendant contends that under the collective bargaining agreement procedure, if a bargaining unit employee feels he or she has been

discriminated against, they could file a grievance, and there is no evidence that Plaintiff filed a grievance. Defendant further contends that during Parker's tenure as foreman, she never sought a transfer to the machine shop. However, Betty Stoner, a female presently employed by the Defendant, testified that she has never sought a position outside the electrical department because she believes Defendant's managerial staff and personnel in the predominately male departments do not want women in those departments. She also testified that when she was hired by Defendant she was interviewed for positions in the electrical department only. She was not informed of any positions available in any other department. Jean Smith, who presently works for Defendant, testified that she made an effort to bid on a promotion in the machine shop. However, Carl Garmon, her male supervisor at the time, took her to the machine shop and showed her the heaviest machine in the department and told her she would have to lift it to do the job. He failed to tell her, which she later learned, that a hoist was used to lift that object. Kitty Wood, presently an employee of Defendant, testified that another employee, Katherine Pfeiffer, was going to bid on a job and Fred Quick asked her not to pursue the position. Wood testified that Quick had considered Wood for promotion to foreman in 1972 but rejected her because he did not think she was interested in the position and promoted Carl Garmon, even though Garmon had never worked in the electrical department before. Wood, like Plaintiff, was not offered the position although she had been in the department during her entire employment with the Defendant. The Court finds it significant that Quick never asked either Plaintiff or Wood if they were interested in the position but merely assumed they were not. The Court finds that males in the Defendant's plant are promoted to foremen while females are denied promotions to foreman even though they are as qualified as males to be promoted.

Based upon the evidence presented, it appears to the Court that women were discouraged from applying for positions outside the electrical department. Therefore, Plaintiff's failure to seek a transfer does not weigh heavily, if at all, in Defendant's favor.

19. The promotion process at Siemens to foreman has no written job criteria, no application and no test. The process is totally subjective and was therefore open to sex discrimination. The process is tainted further by the fact that all persons making decisions for promotion to foreman are and have been white males.

20. Plaintiff testified that there are still no written job criteria for positions which are not protected by the collective bargaining agreement.

21. Qualification for all employment positions by Defendant's plant is obtained by on-the-job training. The Defendant's policy to assign work in a discriminatory manner impacted the Plaintiff's and other women employees' ability to obtain the broad experience on jobs provided to male employees. Besides the experience gained by the actual job performance, Plaintiff attended training programs relating to her particular position both before and after her promotion to foreman in 1974.

22. Plaintiff Parker had no unusual problems as foreman and received no written negative performance evaluations. Written negative evaluations were received by male employees who were retained at the time of Plaintiff's termination.

23. Plaintiff's problems as foreman began when Louis Prather became production manager in 1979. Prather supervised Jim Prince, the general foreman, who in turn supervised the foremen. Although it appears that many employees did not get along well with Prather, the testimony also indicates that Prather was unusually hard on the Plaintiff. Prather began immediately to harass and continually harassed the Plaintiff in front of her subordinates, question her ability as a foreman, and ask her how she became a foreman in the first place. One time Prather called Plaintiff to his office and reminded her there weren't any other women making what Plaintiff was making. These harassments were not

isolated incidents, but occurred in a manner of pattern and practice. Betty Stoner, a white female presently employed by the Defendant, observed Louis Prather harass Plaintiff Parker and other female employees, but never observed him harass or reprimand any male foremen in front of their subordinates. Jean Smith, who presently works in the electrical department at Defendant's plant, also observed Prather's harassment of Plaintiff. Kitty Wood observed Louis Prather tell Plaintiff, about a week after he came to work there, to either "shape up or ship out". Plaintiff's performance as supervisor had never been questioned before. Wood stated that Prather did not act like women could do what men could. Plaintiff also stated that Prather asked her to cut back from two operators in stator repair to one, which was impossible. He told her if she couldn't, he'd find someone who could. There are still two operators there presently.

24. Plaintiff contends that another example of Prather's harassment is referred to often in the testimony as the "Kalamazoo, Michigan" incident. Plaintiff contends that she was required to go by herself, while other foremen went with one or two others. The evidence is conflicting as to whether other foremen were required to travel alone. Carl Garmon testified that when he went out of town, he went with an engineer and safety man. However, he also testified that there were occasions when foremen traveled by themselves, and Jim Prince testified that Bobby Moody went to Maine by himself. The Court finds the evidence less than compelling that Plaintiff was treated discriminatorily with respect to the trip.

25. Billy Payton, a current male employee of the Defendant, worked in the electrical department when Plaintiff was his foreman. He occupied the positions of set-up leadman and the dip and bake position. These positions are the two positions in the electrical department no woman has ever held. Payton further testified that women are capable of doing the work.

Payton transferred out of the electrical department to the machine shop for more money because employees in the machine shop are paid more. He had no trouble transferring. He stated that when you move to a different department you receive about two weeks training in that job. He observed that Prather treated women differently than men; he acted as though he was "higher" than they. He observed Prather treat Plaintiff differently than any other supervisor and that Prather embarrassed Plaintiff in front of other employees.

26. The record was replete with evidence that the Defendant's agent, Louis Prather, discriminated against the Plaintiff in terms and conditions of employment on the basis of her sex.

27. The Court believes the Plaintiff and the corroborating testimony and finds that Prather's actions were intentional acts of harassment because of Plaintiff's sex. The Court finds further that Prather was Defendant's agent and that Defendant knew or should have known about his acts of sex discrimination against Plaintiff, and not only did Defendant condone Prather's behavior, but added to it by discriminatorily terminating Plaintiff. Payton denied Defendant's stated reason for Plaintiff's termination that there was a general reduction in force.

28. On the day following Labor Day, September 2, 1980, Plaintiff was told by Louis Prather that he had to lay off two supervisors and she was one of them. He offered her the opportunity of going back into the bargaining unit into the same position (an entry level position, Grade 1) which she had been offered ten and one-half years earlier. Prather stated "Linda, I don't have to offer you anything".[2] Plaintiff attempted to talk with Mike Goodwin, the EEOC supervisor at the time. Goodwin told Plaintiff that Prather had to eliminate two foremen and that he had to go along with Prather.

---

2. Although Plaintiff was unaware that any other terminated employee was not offered a job, defendant's witnesses testified that not everyone was offered a job.

1382

29. Jim Prince and Prather made the recommendation to terminate Plaintiff to Mike Goodwin. Mike Goodwin had received a directive from management to reduce the staff in September 1980. Each department manager was charged with the responsibility of devising a plan for making reductions in his area. Goodwin's role was to work with the department managers and advise them of the EEOC ramifications of the termination decisions. Goodwin did not discuss EEOC ramifications with Prince and Prather, but was concerned with their suggestion of terminating Plaintiff.[3] Goodwin also stated that he was surprised since he understood the focus was to reduce the machine shop.

30. Larry Croy, a male foreman in the machine shop, was laid off at the same time. The evidence is conflicting as to what position Croy was offered. Plaintiff testified he was offered the position of bullard operator. Defendant's witnesses testified he was offered the position of drill press operator. Irrespective of the title given to the position offered, there is ample evidence to support the fact that the position offered Larry Croy provided for a higher salary than that offered Plaintiff.

31. There was no written procedure for terminating salaried personnel, and they were not protected by the collective bargaining agreement. The decision to terminate Plaintiff was made on the day before she was notified. Only Prince and Prather met in Prather's office and reviewed a list of all foremen showing their date of hire. They had the personnel file there and considered length of service as foremen and work history. The Court finds that Prince's testimony corroborates Prather's that length of time as foreman had been Defendant's primary consideration.

32. Jim Prince testified that they had too many foremen in the machine shop and could have decided to eliminate two out of that department. He testified that although two machine shop positions were eliminated at the time of Plaintiff's termi-

nation, Plaintiff, a foreman in the electrical department, was selected for layoff.

33. He stated they did not consider sex or race of the people involved. The Court does not find Prince's testimony on this issue credible.

34. Prince testified that economic conditions dictated that they retain the most versatile person, but on cross examination he could not explain how Henry Raynor or anyone else who had been retained in the machine shop and had less seniority as supervisor were more versatile than Plaintiff.

35. He admitted that Henry Raynor, foreman in the machine shop, had considerably less seniority as foreman than Plaintiff; had an unsatisfactory performance review in his personnel file and took longer to get promoted to foreman than Plaintiff yet Raynor was retained while Plaintiff was terminated.

36. Prather testified that the criteria for terminating foremen was seniority, qualifications and the ability to perform. Prather further testified that Plaintiff, Linda Parker, had no more problems than any of the other foremen, although she was the only woman foreman in the plant. The performance evaluations were not considered when the decision to terminate her was made. He never saw any written rules regarding layoff of salaried employees. He also testified that Plaintiff's sex was not considered.

37. Defendants, at one point in the discovery process, argued that the decision to layoff the Plaintiff was making a choice between Carl Garmon and the Plaintiff. Prather testified that all ten (10) foremen were considered for the termination.

38. Prince, who testified for the Defendants at trial, corroborated his testimony by stating that all foremen were candidates for termination but that they were told they had too many foremen in the machine shop. The end result was that

---

**3.** Mike Goodwin did testify that he consulted legal counsel when the recommendation was made.

two positions of foreman were eliminated from the machine shop.

39. Prather recalled the termination decision was based on seniority and knowledge of the operations as a foreman.

40. The Court finds from Prather's testimony that seniority as a foreman was Defendant's primary consideration in terminating foremen. The Court finds from other testimony and exhibits that seniority as a foreman was Defendant's prior practice for terminating foremen.

41. The Court finds that if seniority as a foreman was the real reason for the choice then Henry Raynor, Larry Croy, Carl Carlton and Phil Carter would have been terminated before the Plaintiff.

42. The Court finds that Defendant did not follow its own prior practice and that there is evidence of discrimination in this case.

43. Although Defendant's answers to Plaintiff's interrogatories state that Prather and Prince made the decision for Fred Quick to bump Parker, Prather stated unequivocally that bumping was a term he could not relate to and that Siemens had no bumping policy for foremen.

44. Prather anticipated the question would arise as to which job in the bargaining unit foremen being laid-off would be offered, but could not remember which job they would be offered.

45. Plaintiff knew that the Defendant's practice in the past had been to terminate foremen according to seniority. In fact, Defendant's own exhibit bears this out.

46. Prior to Plaintiff's termination Bob Launius had been terminated in December of 1979 with only 2 or 3 years experience as foreman. He was offered the set-up leadman position, which is the next highest paying job to foreman, but he refused to return to the bargaining unit. Percey Billingsley had been terminated in May of 1980 with three years experience as foreman.

47. Plaintiff had six and one half years of experience as foreman and was terminated while three male foremen with less experience as foremen were retained. Although the exhibits are conflicting as to the exact figures with respect to seniority as foreman, even using Defendant's figures, Henry Raynor had only 3 years experience; Carl Carlton had 5 years and 8 months; and Phil Carter had 6 years and 3 months and were retained over Plaintiff, the only female foreman in the history of the plant.

48. Plaintiff's position as foreman in the electrical department was not eliminated. Fred Quick, a male, transferred from the machine shop and was placed in that position at Plaintiff's termination. Two foremen positions were eliminated in the machine shop—the positions held by Larry Croy and Fred Quick.

49. Mr. Quick had been hired on March 27, 1970, one week before Plaintiff was hired on April 6, 1970, when the plant was first opened in Little Rock. He was hired as a motor technician, promoted to leadman, motor repair, Quality Assurance and acting foreman within his first year with Defendant. He was promoted to foreman in the electrical assembly department on October 10, 1971, a position which he held until 1974 when he was promoted to general foreman, electrical assembly. In 1975 Quick was promoted to general foreman of electrical and mechanical assembly and promoted to general foreman in the machine shop on December 1, 1977. He was demoted to foreman in the machine shop in October, 1979.

50. Quick was promoted more often and at a faster rate than Plaintiff.

51. Quick was assigned to work in many different departments throughout his employment with Defendant and he never requested any of the moves. These on-the-job training opportunities were denied Linda Parker.

52. Quick testified that he was demoted from time to time, but his pay was never cut.

53. Defendant contends that it decided to transfer Fred Quick to the electrical assembly department, which resulted in three foremen being placed in the area. Thus, Defendant contends it was then necessary to decide whether Parker or Garmon should be retained. Defendant con-

tends that it compared seniority as a supervisor; that Garmon had been responsible for the operation of the Final Assembly Department on the evening shift and that Garmon had roughly the same seniority as Plaintiff. It appears that the factors considered by the Defendant were those which were a result of promoting Garmon in 1972. The Court has already indicated that Defendant's presumption that Plaintiff would not work the evening shift was no reason not to inquire as to whether she would have accepted the position. Defendant's actions in promoting Garmon clearly had an impact on the subsequent decision to lay off plaintiff.

54. The Court finds that because the electrical department is predominately female while the other production departments are predominately male, this fact of lower pay grade levels for identical positions is, per se, sex discrimination.

55. Plaintiff's production in her area of supervision ran consistently 80 percent or above. Carl Garmon's production slipped below 70 percent consistently, so much so that during Plaintiff's last two years of employment she was required to supervise Garmon's area for six months at a time to bring that production up to 80 percent, which she always did before returning to her own area. While Garmon was supervising Plaintiff's area, production there fell to 70 percent or below and Plaintiff would be required to bring production back to the 80 percent level again. The Defendant denied the above and asserted that it was because Plaintiff borrowed Garmon's employees that Garmon's production fell. The Court finds Plaintiff's testimony more credible.

56. There was no bona fide seniority system for foremen. Yet, prior to Plaintiff's layoff, seniority had been a major determining factor.

57. Plaintiff knew immediately that she had been a victim of sex discrimination. The Defendant's discriminatory act of offering the Plaintiff a Grade Level 1 job while offering the male foremen a higher grade level is sex discrimination and violative of Title VII.

58. Plaintiff has never before filed a charge of discrimination and did not have an attorney at the time of filing her charge.

59. Mr. Elbert Morgan, a current male employee, testified that he knew of no written policy for promotion out of the bargaining unit into first line supervisory positions. He does not know how they are filled. The Court finds that Defendant has no objective policy for promotion out of the bargaining unit into first line supervisor.

60. He testified that the electrical department is predominantly female and the pay is lower than in the machine shop or final assembly departments which are predominantly male.

61. This Court finds that the difference in pay of level one and five positions demonstrates that they are not equal job opportunities. Therefore the Defendant clearly discriminated against Plaintiff by offering her a position of lower pay grade than those offered males being laid off or terminated.

62. Ralph Shilling, the present supervisor of personnel for Defendant, admitted that prior experience in a department was no prerequisite to supervise in that department as evidenced by Garmon's supervision of the electrical department and his own supervision of the tooling department. Neither had worked in those departments prior to becoming supervisor.

63. Shilling did not occupy his present position when the decision was made to terminate Plaintiff. He testified that Prather who was production manager and Jim Prince who was general manager were charged with the duty to decide which of the foremen would be terminated.

64. Shilling became EEO coordinator in 1981 when the OFCCP issued its letter of deficiencies.

65. He was aware that OFCCP was doing job audits during 1980, at the time Plaintiff was terminated. His duty as EEO coordinator was to make management aware of the implications of employment decisions and to revise the Affirmative Action Plan to correct the deficiencies noted in the OFCCP's letter, which noted severe

underrepresentation of females in supervisory positions and certain production departments.

66. He testified that he was aware that Plaintiff was the only female foreman at the time of her termination and he admitted that no female has been promoted to production supervisor since Plaintiff's termination.

67. Shilling testified that he would not consider the fact that Plaintiff was the only female supervisor to be reason enough not to terminate her, even with her positive performance record. He testified that he would not consider her sex when making the selection for termination.

68. Shilling was unaware whether Plaintiff's termination was in violation of Defendant's Affirmative Action Plan in effect at the time.

69. Robert Baker is a professor at Hendrix College who is employed on a regular basis by the law offices of counsel for the Defendant as an expert in Title VII cases.

70. On the day of trial, counsel for the Plaintiff objected to the testimony of Dr. Baker, arguing that the Defendants had violated the duty created by Federal Rule 26 in failing to notify them of an expert, by stating in answers to interrogatories that no expert would be used, and that they had not timely included Baker's name on the witness list.

71. Baker stated that he was not retained to testify in this matter until after Defendant received the Plaintiff's pre-trial submissions. The Court allowed Dr. Baker's testimony to be received, noting that Plaintiff knew Dr. Baker would testify as early as May. The Court did require Dr. Baker to be available for examination by Plaintiff.

72. Some of the deficiencies noted by OFCCP were underrepresentation of females in supervisory positions; lower wages for females despite higher female seniority; overrepresentation of females in the electrical department where wages are lower, and underrepresentation of females in the machine shop where wages are higher.

73. Baker's Exhibit 5–2 showed movement out of the electrical department, which was at least 85% female over the years 1977, 1978, and 1979. In each of those years, the percentage of persons moving out of the electrical department ·was disproportionately male.

74. In 1977 out of 10 persons moving out of the electrical department, three were males or 30%, twice the percentage of male employees in that department.

75. In 1978 of five movements out of the electrical department, two were male, or 40%, almost three times the male percentage of the department.

76. In 1979, out of seven, two were males for 28.5%.

77. Goodwin testified he wrote the AAP himself. He stated on page 142 of the plan his reasons for not considering female concentration in electrical winding to be discriminatory as:

There are some things about the job that appeal to the females such as: clean working conditions, routine work, which once learned, gives the female the opportunity to plan the family budget, menu and other responsibilities directly related to family ties.

The Court finds any AAP with this clause to be a per se violation of Title VII. The Court finds that a discriminatory employment decision was placed on Goodwin's desk and he failed to veto it. This is conclusive evidence of Defendant's practice of sex discrimination.

78. Goodwin testified that a general downturn in business forced them to a reduction to save money.

79. Even if the Court were to believe a reduction in force was necessary, this Court is not convinced by Goodwin's testimony of any facts which explain the selection of Linda Parker for layoff in a nondiscriminatory fashion.[4] Therefore this Court

4. The only objective evidence of a downturn in business is the reduction in total workforce between 1978 and 1981.

finds Plaintiff was selected for layoff because of her sex in violation of Title VII.

80. This Court finds, further, that Plaintiff was discriminated against on the basis of sex by being offered a position at a lower pay grade than male foremen being laid off.

81. Plaintiff, after ten (10) years of employment, with no negative written evaluations, was offered the lowest level position in the plant—the one she began in 10 years before.[5] Recognizing that she was being discriminated against because of her sex and that Defendant was intentionally making an effort to force her out, she refused the position and filed her EEOC charge.

82. The OFCCP letter of February 4, 1981, to Defendant from the OFCCP outlines several areas of deficiency in which Defendant does not comply with federal regulations for maintaining its federal contracts. At the time of Plaintiff's termination, however, its work force did not comply, particularly in the area of female representation at the supervisory and managerial levels.

83. Another deficiency noted was Defendant's underrepresentation of females in the high paying departments of the plant, namely, the machine shop and final assembly, and overrepresentation of females in the lowest paying department, namely, electrical. This is corroborated by all of Plaintiff's witnesses and even some of Defendant's witnesses who admitted that positions in the machine shop paid better than "equivalent positions in the electrical department" (Prince's testimony). This evidence is corroborated by Defendant's work force analysis in its Affirmative Action Plan.

84. The Court finds that Plaintiff was a victim of this plant-wide sex discrimination in that she was denied the opportunity to move freely from department to department for advancement and this denial adversely impacted on Plaintiff when the decision was made to terminate two foremen.

Defendant denied the opportunity for Plaintiff to become versatile and to develop vital skills needed plantwide.

85. Although Defendant has denied that it has a bona fide seniority system for foreman, its past actions and past and present attitudes indicate that it relied on some sort of seniority rationale to justify retaining Garmon over Plaintiff.

86. The rationale of "experience as foreman" however, does not explain why Plaintiff was terminated while Raynor, Carter and Carlton were retained with less experience as foremen. In fact, Plaintiff had actually worked in the machine shop while Raynor, et al., had never worked in the electrical department.

87. The Court finds that Defendant discriminatorily applied its "experience as foreman" factor against Plaintiff.

88. In answer to Interrogatory No. 19, Defendant stated that there were no reassignments or transfers of supervisory personnel during the three years prior to Plaintiff's termination. The testimony of witnesses was to the contrary and Mike Goodwin testified that this answer was wrong. Witnesses testified that prior to Plaintiff's termination other foremen had been offered high paying jobs back in the bargaining unit.

89. Mike Goodwin attempted to explain why Plaintiff could not be offered a high paying job back in the bargaining unit, but his attempt fails to explain why the male who was terminated on the same day could be offered a Grade Level 5 while Plaintiff could be offered only a Grade Level I position.

90. The Court finds that Defendant has deliberately attempted to conceal from Plaintiff the true reasons for her termination. The Court finds this to be evidence of intentional discrimination and finds that Plaintiff has sustained her burden of persuasion that she was a victim of intentional

---

5. There was evidence introduced that management did have to talk with Plaintiff about some performance difficulties, i.e., lack of sensitivity toward employees, failure to answer a foreman's page; and borrowing employees. However, it is apparent that these discussions were not an indication that plaintiff had any more problems than any other supervisor. In fact, Louis Prather so stated.

disparate treatment and suffered job discrimination because of her sex.

91. With respect to salaries, Plaintiff's salary was $1447; Bobby Moody's was listed as $1554 and he was hired four months after Plaintiff; Carl Garmon's was listed as $1529 and he was hired a week after Plaintiff; Carl Carlton's was listed as $1114, but testimony at trial showed his salary to be $1447 and he was hired two and one-half years after Plaintiff. Phil Carter's official pay records show his salary to be $1430.00 and he was hired four months after Plaintiff. These answers show that although Plaintiff was hired before these males, her salary was equal to one and below all but one.

92. Defendant's EEOC creed was shown to be as follows:

Employment, promotion, transfer, demotion, compensation and separation decisions at Siemens-Allis shall be based only on appropriate combinations of such factors as skills, knowledge, merit, service, physical fitness, capacity and ability to effectively perform the assignments. *These shall be determined, as appropriate, by work and education reviews, interviews, examinations and tests, reference checks and analysis of total job requirements* without regard to such non-pertinent factors as race, creed, color, sex, age, ancestry or national origin". (Emphasis added).

93. The Court finds from Mike Goodwin's testimony that this Creed was not followed when the decision to terminate Plaintiff was made.

94. Plaintiff's exhibits show that Henry Raynor received written warning on January 30, 1979, "that his performance, in the area of quality workmanship from his department, had not been satisfactory and improvement *must* be made." It was signed by Louis Prather. His 1979 progress review showed that his overall promotability was only acceptable and that he would not be ready for promotion for 3 years. It was signed by Mike Goodwin and Louis Prather.

95. Jim Prince placed a handwritten memo in Richard Rogers' personnel file on June 5, 1980 (three months prior to Plaintiff's termination) on the subject of his job performance. The memo begins "This memo is being placed in Richard Rogers' file to document a substandard performance in his responsibilities as a foreman." Rogers was retained over Plaintiff in September 1980 and the decision was made in part by Jim Prince.

96. Carl Garmon's progress review for 1979 shows a specific goal for him was to operate at 90 percent measured and 71 percent earned efficiencies and that he made progress in that it was accomplished in some weeks. This evaluation was signed by Jim Prince and Louis Prather. In his progress review dated January 29, 1981, (four months after Plaintiff's termination), one of his specific goals was *to improve* performance to 80 percent effectivity level and was signed by Jim Prince.

97. The Court finds that Defendant did not retain those employees with superior basic skills and did not retain these employees because their ability of performance was better than Plaintiffs.

98. The Court finds that Defendant's articulation of its relative ability criteria for deciding which foremen to retain is not the true basis on which it made its decision to terminate Plaintiff. The Defendant had no objective criteria for making its decision to terminate Plaintiff.

99. The Court finds that even if there was a general reduction in force because of business downturn, such reduction is not a legitimate reason to explain Defendant's method of deciding to terminate Plaintiff.

100. Defendant states that its comprehensive Affirmative Action Plan has been developed to provide employment training and upgrading to minorities and women in its workforce. Robert Hunter is identified as the EEO Coordinator.

101. The Court finds that Defendant did not pay even lip service to its affirmative action duty as articulated in its Affirmative Action Plan when it terminated Plaintiff.

102. The fact that none of the males who were in the position to decide Linda

Parker's fate considered the fact that she was the only female foreman in the history of the plant is evidence of the Defendant's callous disregard of even minimal EEO obligations.

103. On pages 10 through 12 the responsibilities for implementing the Affirmative Action Plan are spelled out for the EEO Coordinator and management. One of those responsibilities is to assist all management to identify problem areas, find solutions and make corrections and to prevent problems in the first place.

104. If the above responsibilities are intended to give the EEO Coordinator veto authority over any employment decision, Mike Goodwin's failure to do so is clearly further evidence of Defendant's insensitivity to EEO matters as far as sex is a consideration.

105. Another responsibility of higher management is to evaluate the EEO efforts and performance of lower management in selecting, training, upgrading and promoting progressive attitudes toward minority and female employees. Additionally, in July the Defendant pledged to review the qualifications of employees to assure that minorities and women receive consideration for available opportunities.

106. The Court finds that Defendant failed to evaluate the efforts and performance of lower management in the present case in that Prather and Prince were not counseled about the EEOC ramifications of selecting Linda Parker for termination.

107. Finally, the company pledged to assure that recruiting, hiring, layoffs and returns from layoffs will be administered in keeping with the Siemens-Allis Equal Employment Opportunity Creed.

108. The Court finds that neither the selection process used to choose foremen for termination nor the jobs offered the two foremen were in keeping with the Creed.

109. A work force analysis for 1980 is contained within the Affirmative Action Plan by department, sex, race, name and grade level. Fred Quick is shown as a Grade Level 56 foreman in the general machine shop. This analysis also shows that the foreman positions in the electric winding department are grade 54 while the foreman positions in the machine and final assembly shops, the male departments, are grade 55.

In conclusion, even if the Court were to conclude the supervisors were terminated as a result of reduction in force, the Court is compelled to conclude that the manner in which Plaintiff was chosen to be terminated as a result of the reduction in force was discriminatory. Considering all the evidence and the totality of the circumstances, the Court finds Plaintiff was terminated on the basis of her sex. It is the duty of the Court to assess credibility of the witnesses, and to that extent, the Plaintiff has prevailed.

## CONCLUSIONS OF LAW

■ 1. The promotion claim raised in the complaint is "like or related" to the substance of the plaintiff's EEOC charge, and is therefore properly addressed by the Court. *Satz v. ITT Financial Corp.*, 619 F.2d 738 (8th Cir.1980).

2. Plaintiff, Linda Parker, has established a prima facie case of sex discrimination in employment because:

A. She was qualified for the position;

B. She was discharged from her position;

C. A male was placed in Plaintiff's position at her termination. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).[6]

3. The Defendant failed to articulate any legitimate nondiscriminatory reason for Plaintiff's layoff/termination that ap-

---

**6.** *Cf. Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1307 (8th Cir.1984), where the Court held that to establish a prima facie case of discriminatory discharge, plaintiff must show that (1) he is a member of a protected class; (2) he was capable of performing his job satisfactorily; and (3) he was discharged. In the present case, plaintiff's case was bolstered by the fact that a male was placed in her position at her termination.

pears to be the real reason for the employment decision. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

4. The Defendant utilized shifting reasons as its defenses that are unworthy of credence and are a mere pretext for sex discrimination.

5. Plaintiff was terminated by the Defendant because of her sex in violation of 42 U.S.C. § 2000e.

6. By Defendant's own admission, Plaintiff was terminated.[7] However, even assuming a layoff argument, the facts exist for a constructive termination. An employee is constructively discharged when he or she involuntarily resigns to escape intolerable and illegal employment requirements. *Barrett v. Omaha National Bank,* 726 F.2d 424 (8th Cir.1984). *See also, Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981). Although working for unequal pay alone may not constitute a condition of employment so intolerable that an employee is forced into involuntary resignation, *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980), it is nevertheless relevant. *Id.,* 617 F.2d at 66. In this case, evidence of continuing discrimination on the basis of sex in the form of transfers, unequal pay and harassment was presented which would enable the Court to conclude a constructive discharge took place. *Id.; See also, Fancher v. Nimmo,* 549 F.Supp. 1324 (E.D.Ark.1982).

7. Plaintiff was the victim of sex discrimination during her entire employment history with Defendant. She is entitled to such remedies as will make her whole.

8. Plaintiff is entitled to back pay in the amount of her salary times the number of months to the present, together with aver-age pay increases as reflected in Defendant's records for the foremen who were retained. According to Plaintiff's testimony, she was unemployed for one year, and then became employed earning $850.00 per month. She received approximately $3,500.00 in severance pay. She is entitled to pre-judgment interest of ten (10) percent on that amount plus post-judgment interest at the current rate until paid. *Behlar v. Smith,* 719 F.2d 950 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2169, 80 L.Ed.2d 552 (1984).

9. Plaintiff is entitled to damages for harassment she suffered at the hands of Defendant's agent, Prather. *Id.*

10. Plaintiff is entitled to be reinstated and if no such position exists, she is entitled to front pay equal to the difference between what she would have earned in the foreman's position and the amount she earns in mitigation. She is moreover entitled to continue to receive these payments until she is placed in a comparable position whenever that placement occurs. *Briseno v. Central Technical Community College Area,* 739 F.2d 344 (8th Cir.1984); *United States v. Cotton Plant School District No. 1,* 479 F.2d 671 (8th Cir.1973).

11. Plaintiff is entitled to her attorneys fees upon application to the court made timely after the date of this judgment pursuant to Title VII.

Plaintiff is directed to prepare a precedent for judgment in accordance with these findings and submit it to the Court within ten (10) days from the date of these findings. Plaintiff's counsel should also file with the Court their motion for attorney's fee and supporting information within ten (10) days from the date of these findings. Defendant will have ten days from receipt thereof to respond.

---

**7.** In Defendant's Answers to Plaintiff's Second Interrogatories, Defendant states:

There is no significant difference between Plaintiff's separation being characterized as a lay-off or termination for employment or reemployment. Plaintiff's separation was similar to a lay-off in that it was the result of a general reduction in force caused by de-pressed business conditions. Thus, Plaintiff was given an opportunity to return to the bargaining unit, an opportunity that was rejected by Plaintiff. However, since salaried employees are generally terminated and not laid-off, as a result of her declining the opportunity to return to the bargaining unit, she was terminated.

It is so ordered this 30th day of January, 1985.